UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT FLORIDA

| | |
|---|---|
| INTERCOL JV CORPORATION, a )<br>Republic of the Marshall Islands )<br>corporation, and VICTORIA GIRALDO, )<br>an individual, )<br> )<br>  Plaintiffs, )<br>VS. )<br> )<br>BAL HARBOUR QUARZO, LLC, a )<br>Florida limited liability company, JUAN )<br>G. ARCILA, individually, CARLOS )<br>MAHECHA, individually, SYNERGY )<br>CAPITAL GROUP, LLC, a Florida )<br>limited liability company, OA )<br>DEVELOPMEMTS, INC., a Florida )<br>corporation and LUNA DEVELOPMENTS )<br>GROUP. LLC, a Florida limited liability )<br>company, )<br> )<br>  Defendants. )<br>_____/ | CASE NO: _____ |

## COMPLAINT AND DEMAND FOR JURY TRIAL

The Plaintiffs, Intercol JV Corporation and Victoria Giraldo, sue the above-captioned

Defendants in this matter, and in support thereof, state as follows:

## NATURE OF THE CASE

1.     This is an action for damages in excess of $75,000.00 by the Plaintiffs against the

named Defendants for Federal securities fraud, common law fraud, civil racketeering pursuant to

Florida statutory law, violation of Florida's Unfair and Deceptive Trade Practices Act,

conversion, for an accounting and for the imposition of an equitable lien, reformation and breach

of contract.

2.      All of Plaintiffs' claims are based on Defendants' misconduct in connection with certain promissory notes issued to Plaintiffs totaling approximately three million dollars ($3,000,000.00) (collectively the "Promissory Notes").

## THE PARTIES

3.      Plaintiff Intercol JV Corporation ("Intercol") is a foreign corporation incorporated in the Republic of the Marshall Islands, with its offices located in Bogota, Colombia.

4.      Plaintiff Victoria Giraldo ("Mrs. Giraldo") is a resident of Miami-Dade County, Florida.

5.      Defendant Bal Harbour Quarzo, LLC ("Quarzo") is a Florida limited liability company with its principle address at 1395 Brickell Avenue, Suite 1021, Miami, Florida 33131.

6.      Quarzo is the maker of the underlying Promissory Notes which form the basis of this action.

7.      Quarzo also operates a Luxury Boutique Hotel known as Bal Harbour Quarzo Hotel (the "Hotel").

8.      Defendant Synergy Capital Group, LLC ("Synergy") is a Florida limited liability company with its principle address at 1395 Brickell Avenue, Suite 1021, Miami, Florida 33131.

9.      Synergy is the entity officially responsible for procuring foreign investors such as Intercol to invest in Quarzo, and the entity that actually procured the Plaintiffs to make the underlying loans to Quarzo covered by the subject Promissory Notes.

10.      Defendant OA Developments, Inc. ("OA Developments") is a Managing Member of Quarzo.

11.     Defendant Juan G. Arcila ("Arcila") is the President of OA Developments, a Managing Member of Quarzo, a Managing Member of Synergy and a resident of Miami, Dade-County, Florida.

12.     Defendant Carlos Mahecha ("Mahecha") is a Managing Member of Quarzo, a managing member of Synergy and a resident of Miami-Dade County, Florida.

13.     Defendant Luna Developments Group, LLC ("Luna") is a Florida limited liability company also owned and operated by Arcila, Mahecha and OA Developments.

## JURISDICTION AND VENUE

14.     This Court has federal claims jurisdiction over the subject matter of this action pursuant to § 27 of the Securities Exchange Act, 15 U.S.C. § 78aa.

15.     This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1331.

16.     Venue is proper in this Judicial District pursuant to § 27 of the Securities Exchange Act, § 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).

17.     Venue is proper in this Judicial District because, at all relevant times, Defendants Arcila and Mahecha have been residents of Miami-Dade County, Florida, Defendants Quarzo, Synergy, OA Developments and Luna have had their principal place of business located in Miami-Dade County, Florida, and the causes of action asserted in this cause have accrued in Miami-Dade County, Florida.

18.     Moreover, the underlying securities transactions were consummated at or from Miami Dade-County, Florida, the false and materially misleading financial documents employed by the Defendants was created in Miami-Dade County, Florida, and the false and materially misleading misrepresentations and omissions were made in or from Miami-Dade County, Florida.

## OVERVIEW OF THE DEFENDANTS' ILLICIT SCHEME

19.     Beginning sometime in late 2006, the Defendants concocted and began to carry out a scheme to defraud through the use of fraudulent misrepresentations and material omissions of fact in connection with the sale of securities.

20.     The masterminds of the scheme are Defendants Arcila and Mahecha.

21.     In order to carry put their scheme, Defendants Arcila and Mahecha created and employed multiple corporate and business instrumentalities, including OA Developments, Synergy, Quarzo and Luna.

22.     Arcila and Mahecha have employed the aforementioned entities for unlawful purposes such as improperly diverting the funds of investors in order to personally enrich themselves and to attempt to insulate themselves and their ill-gotten gains from personal liability.

23.     At all times, OA Developments, Synergy, Quarzo and Luna have been but mere alter-egos and instrumentalities of Defendants Arcila and Mahecha, and have been used by them without proper regard for their corporate fiction and status as purported independent business entities.

24.     At the heart of Defendants' scheme was their plan to target unsophisticated foreigners from Colombia and other under-developed Latin American countries and lure these individuals into investing large sums of money into a hotel project that was being undertaken by the Defendants (the "Quarzo Hotel Project" or the "Project").

25.     On or about October 25, 2007, using money borrowed from investors and a mortgage loan obtained from Mercantil Commercialbank, N.A. in the amount of $15,500,000.00 (the "Quarzo Mortgage Loan"), the Defendants acquired three adjacent parcels of land upon each of which stood apartment complexes that were being rented out and leased for residential use.

4

26.     The three adjacent apartment complexes were located at 10250 Collins Drive ("Building I"), 290 Bal Bay Drive ("Building II), and 291 Bal Bay Drive ("Building III").

27.     At the time they entered the Quarzo Mortgage Loan, Arcila and Mahecha were aware that they could not possibly generate sufficient income from Quarzo's operations to pay the interest payments thereon as they came due and certainly would not be able to pay the principle amount at maturity.

28.     As a result, at all times, Arcila and Mahecha intended to procure more and more investors in the Quarzo Hotel Project and to use the investors funds to pay the monthly interest payments and to finance the renovations contemplated by the Project.

29.     Through the use of deception, misrepresentation and high-pressure tactics, the Defendants sought to convince the would-be victims of the scheme to invest into the Quarzo Hotel Project by promising them unrealistically high rates of return on their investments that Defendants knew they could not possibly hope to pay the investors.

30.     Potential investors were told that their investments would be used to fund an extensive renovation of the apartment buildings purchased by the Defendants, which would be converted one-by-one from rental apartments into a high end Luxury Boutique Hotel.

31.     First, the tenants from Building I would be evicted and Building I would be renovated and converted to Hotel property while Buildings II and III would continue to be rented as apartments.

32.     Once Building I's renovation was complete, the tenants of Building II would be evicted and Building II would be renovated and integrated as part of the Quarzo Hotel, while the units of Building III remained rented out as residential apartments.

33.     In the final phase of the Project, Building III would be renovated and integrated as part of the Quarzo Hotel as well.

34.     Unsophisticated foreigners, many of who could not even read and write English, were targeted pursuant to the Defendants' scheme due to their particular vulnerability and the fact that it would be unlikely such investors had the savvy, knowledge, experience, and United States connections to fully and properly investigate the bonafides of the Quarzo Hotel Project and the Defendants prior to investing.

35.     In support of their scheme, Defendants established a satellite office for Quarzo and Synergy in Bogota, Colombia.

36.     From their satellite office in Colombia, Arcila, Mahecha and other agents and employees of Synergy and Quarzo would woo potential investors by showing them an elaborate video presentation of the Project and presenting them with fabricated projections of Quarzo's anticipated revenues and profitability, projections that Arcila and Mahecha knew were grossly exaggerated and materially misleading.

37.     In order to carry out what is essentially a Ponzi Scheme, the Defendants have continuously sought additional investors and have used the capital generated by subsequent investors to pay the high rates of interests promised to the earlier investors.

38.     Also, in furtherance of their scheme to defraud, Defendants enlisted "Promoters" to essentially function as transactional brokers whereby the Promoters would be paid a finder's fee for procuring investors in the Quarzo Hotel Project.

39.     The aforementioned finder's fees were quite substantial, between five to ten percent (5-10%) of the amounts invested by the procured investors.

40.     Like all Ponzi Schemes, the Defendants' scheme ultimately must collapse under its own weight, as there is simply impossible for the Defendants to meet the interest obligations to existing investors without bringing in more and more investors, also lured into investing by unrealizable promises of high returns that cannot possibly be paid to those new investors from the revenues generated by the Quarzo Hotel Project.

## INTERCOL FALLS PREY TO THE DEFENDANTS' SCHEME

41.     Intercol was first introduced to Quarzo's Hotel Project by one of the Defendants' Promoters, an individual by the name of Raul Serebrenick ("Serebrenick").

42.     Serebrenick had known Intercol's principal, Jaime de Jesus Vargas Arevalo ("Vargas") since the year 2000.

43.     For several years, Vargas had an office adjacent to Serebrenick's office, and over time Vargas came to know Serebrenick quite well, and eventually grew to consider Serebrenick a "friend."

44.     Serebrenick convinced Vargas to meet with Arcila and Mahecha so that they could present him with a presentation regarding what Serebrenick described as an incredible investment opportunity in the Quarzo Hotel Project.

45.     During July 2009, Vargas met for the first time with Arcila and Mahecha, and those Defendants showed Vargas an elaborate video highlighting and extolling the virtues of the Quarzo Hotel Project, provided him with several brochures, and made a verbal presentation setting-forth the Project as a "can't miss" investment opportunity.

46.     As part of the aforementioned presentation, Arcila and Mahecha presented Vargas with projected revenue and profit figures which indeed seemed to indicate that the Hotel was a "can't miss" proposition.

47.     At that time, Arcila and Mahecha represented that the proposal was for Intercol to purchase stock and to become a shareholder in Quarzo, and that they were guaranteeing a minimum return of ten percent (10%) per year, paid in semiannual installments.

48.     According to Arcila and Mahecha, the 10% yearly return figure merely represented the absolute floor and that Intercol's actual return could be much higher depending on the actual overall profitability of the Project.

49.     Also according to Arcilla and Mahecha, the principal investment amount would be returned to Intercol by December 31, 2012.

50.     At the conclusion of the aforementioned meeting, Vargas advised Arcila and Mahecha that he would require some time to consider the proposal and would get back to them with his decision.

51.     However, Arcila and Mahecha did not sit by and wait for Vargas to call them with his answer.  Instead, on multiple occasions over the next several weeks, Arcila and Mahecha telephoned Vargas and sent him emails pressuring him to go through with the transaction and urging him to send the money and secure his investment right away.

52.     The aforementioned telephone calls were made from Miami and the emails sent by Arcila and Mahecha were sent from their Quarzo's offices located at 1395 Brickell Avenue, Suite 1021, Miami, Florida 33131.

**AN INITIAL DEAL IS REACHED**

53.     During one such telephone conversation initiated by Mahecha from Miami to Vargas during the month of August, 2012, a deal was struck between Quarzo and Intercol whereby Intercol would invest $1,716,000.00 in the Project, the price of acquiring three percent of Quarzo's stock.

54. Pursuant to the aforementioned agreement, Intercol would receive a guaranteed yearly rate-of-return of ten percent ("10%") of its investment, paid semiannually.

55. Intercol would also be entitled to a proportionate share of Quarzo's profits in excess of the minimum guaranteed 10% depending on the Hotel Project's net revenues.

56. That initial transaction was consummated on August 26, 2009, when Intercol wire-transferred a payment of $1,716,000.00 to a Quarzo's bank account in Miami.

57. On that same date, Arcila sent a letter from Miami to Intercol in Colombia confirming that Intercol had become a 3% owner of Quarzo, and advising Vargas that, as a shareholder, he would be entitled to stay free of charge at Quarzo's Luxury Boutique Hotel for two weeks each year.

58. In his August 26, 2009 letter, Arcila memorialized his verbal promise that Intercol was entitled to receive a rate of return in excess of the minimum guaranteed 10% depending on the Hotel Project's net proceeds.

59. The aforementioned August 26, 2012 letter was officially sent by Arcila in his capacity as Managing Partner for Quarzo.

60. During the next several months, Arcila and Mahecha continued to contact Vargas via telephone calls and emails sent from Miami to Colombia urging him to purchase additional shares of Quarzo, and also urging him to come to Miami to take advantage of his complimentary stay at the Quarzo Hotel.

61. Vargas agreed to come to Miami and stay at the Quarzo Hotel.

62. During his stay at the Quarzo Hotel, Arcila introduced Vargas to Hotel staff members as a Shareholder of Quarzo.

63.     Also during his visit to Miami, Arcila and Mahecha were finally able to convince Vargas to invest additional sums in Quarzo.

64.     Pursuant to negotiations between those Defendants and Vargas, Intercol committed to purchase additional Quarzo stock, at a discounted price.

65.     Pursuant to the aforementioned oral agreement, Intercol would pay an additional $504,000.00 and its total ownership in Quarzo would rise to six percent (6%).

66.     Also pursuant to the aforementioned oral agreement, on December 18, 2009, Intercol wire-transferred a payment of $500,000.00 to a Quarzo's bank account in Miami.

67.     On January 20, 2010, Arcila sent a letter from Miami to Intercol in Colombia written on joint Synergy/Quarzo letterhead confirming Intercol's total investment in the amount of $2.22 million.

68.     The aforementioned letter specifically sets forth Intercol's entitlement to a 10% rate of return on the principle amount invested.

69.     On February 1, 2012, Intercol wire-transferred from Colombia to Miami a final payment of $4,000.00, bringing Intercol's total investment in Quarzo to $2.22 million.

## THE FIRST INTERCOL PROMISSORY NOTE

70.     Although Arcila and Mahecha represented to Vargas that Intercol's investments in Quarzo were in the form of stock purchases, on or about December 18, 2009, Quarzo issued Promissory Note # 1020149 to Intercol in connection with a purported loan made by Intercol to Quarzo in the principal amount of two million two hundred twenty thousand dollars ($2,220,000.00) (hereinafter referred to as the "First Intercol Promissory Note" or the "First Intercol Note").  A copy of the First Intercol Promissory Note is attached hereto as Exhibit "A."

71.     The First Intercol Note contained a maturity date of December 18, 2012, on which Quarzo was to repay the entire principal to Intercol.

72.     Until maturity, Quarzo was obligated under the First Intercol Note to pay Intercol interest on the principal amount at the minimum rate of 10% (ten percent).

73.     Although the First Intercol Note affirmatively sets forth that the 10% interest figure represented only the "floor" as far as the interest that Intercol would be entitled to, and that the interest "[r]ate may be adjusted to from time to time as agreed by the parties", it did not specifically reflect the promise made to Vargas by Arcila and Mahecha that Intercol would also be entitled to a proportionate share of the profits above-and-beyond the 10% return depending on Quarzo's net revenues.

74.     Based on the minimum 10% interest rate, Quarzo was obligated to pay Intercol no less than $222,000.00 per year in interest payments until maturity, which breaks down to $608.22 in interest per day.

75.     Pursuant to the terms of the First Intercol Note, accrued interest was to be paid semi-annually.

76.     The First Intercol Note, which Quarzo has referred to as a "convertible bond," expressly provided Intercol with the right and option to convert the note to an equity or membership interest in Quarzo.

77.     Intercol's option to convert the debt to stock, however, was not unqualified, but was instead subject to Arcila's and Mahecha's absolute right to purchase the First Intercol Note.

78.     The First Intercol Note also granted Quarzo the unconditional right to extend the maturity date for an additional two years, provided that Intercol had not exercised its option to convert the Note into a membership interest in Quarzo.

79.     However, Intercol's right to extend the maturity date was never discussed by the Parties or agreed to by Intercol, and was unilaterally inserted into the language of the First Intercol Note by Quarzo after the final terms of the investment agreement had already been reached by the Parties.

80.     Other than the right to receive a return of 10% per year on the principle invested, none of the terms of the First Intercol Note reflected the actual agreement between Quarzo and Intercol, in which Intercol was to have actually purchased 6% of Quarzo's stock.

## DEFENDANTS' FRAUD PERPETRATED ON INTERCOL

81.     Intercol was fraudulently induced by the Defendants into making the $2.22 million loan to Quarzo and entering into the First Intercol Promissory Note.

82.     During their initial face-to-face meeting with Vargas during July 2009 and in order to induce Intercol into investing in Quarzo, Defendants Arcila and Mahecha, in their capacity as agents, representatives and Members of Defendants Quarzo, Synergy, and OA Developments, presented Vargas with projected revenue and profit figures for the Quarzo Hotel Project which purportedly established that the Project would be a raging success and would quickly begin generating tidy, sustainable profits that would only increase over time as the Project continued to advance towards final fruition.

83.     The aforementioned projections were false and deliberately contrived by Arcila and Mahecha to create an inaccurate and distorted picture of profitability and thus lure potential investors such as Intercol to invest in the Project.

84.     As Arcila and Mahecha were aware, the projections not only violated Generally Accepted Accounting Principles, but were also based on false and inaccurate figures which failed

to account for Quarzo's liability to re-pay several million dollars in loans, as well as millions in loan interest payments that were already due or would soon become due.

85.     Intercol did, in fact, rely on the aforementioned inaccurate and misleading financial figures and projections and would not have invested the $2,220,000.00 into the Quarzo Hotel Project but for Vargas' belief in the accuracy and reliability thereof.

86.     Also during their initial face-to-face meeting with Vargas in Defendants' satellite office in Bogota Colombia, and in order to induce Intercol into investing in Quarzo, Defendants Arcila and Mahecha, in their capacity as agents, representatives and Members of Defendants Quarzo, Synergy, and OA Developments, falsely represented to Vargas that the Hotel and the real estate that it was on had a market value in excess of $30 million, with a total debt of only between $14-$17 million.

87.     Specifically, Arcila and Mahecha represented to Vargas that the bulk of Quarzo's total debt was $15,500,000.00 originally borrowed from Mercantil Commercebank, N.A. ("Mercantil Commercebank"), which was used to purchase the subject properties (the "Quarzo Mortgage").

88.     Arcila and Mahecha also represented that the majority of the remaining funds used by Quarzo to finance the Hotel project came from Arcila and Mahecha themselves, who purportedly had invested $8.5 million of their own funds into Quarzo.

89.     Arcila and Mahecha's claim that they invested $8.5 million of their own funds in the venture constituted a material representation and was relied upon by Vargas in reaching Intercol's decision to invest the $2.22 million, as Vargas found reassuring and compelling that Arcila and Mahecha would risk so much of their own funds in a project.  To Vargas, such a large

personal investment by Quarzo's principals demonstrated their complete and unfettered commitment to, and belief and confidence in, the venture.

90. The aforementioned representations made by Arcila and Mahecha were false, and Arcila and Mahecha knew of their falsity when made.

91. Specifically, at the time Arcila and Mahecha made the aforementioned misrepresentations, each was aware that Quarzo had already borrowed several million dollars from several other investors on similarly-structured convertible notes, which represented significant liabilities that were deliberately secreted from Vargas.

92. Moreover, Arcila and Mahecha knew quite well that they had not, in fact, invested $8.5 million of their own funds as claimed, but had instead relied on outside sources to finance Quarzo's Hotel project.

93. Arcila and Mahecha also failed to disclose the existence of a Cross-Collateral and Cross-Default Agreement entered into with Mercantil Commercebank on December 12, 2007 (the "Cross-Collateral Agreement"), and did so deliberately in order to induce Intercol into making the $2.22 million investment in Quarzo.

94. Pursuant to the Cross-Collateral Agreement, Quarzo had assumed liability for a principal loan in the amount of $17,640,000.00 extended by Mercantil Commercebank to a separate and distinct entity, Defendant Luna (the "Luna Mortgage").

95. Accordingly, Arcila and Mahecha's failure to disclose the Cross-Collateral Agreement to Intercol had the result of under-representing Quarzo's liabilities by more than seventeen-and-a- half million dollars.

96. Luna is a Florida limited liability company also owned and operated by Arcila and Mahecha.

97.     Luna owns and operates a condominium conversion project.

98.     As a result of the Cross-Collateral Agreement, any default by Luna on its loan from Mercantil Commercebank would automatically be considered a default by Quarzo on the Quarzo Mortgage and subject the Quarzo Hotel and corresponding real estate to foreclosure.

99.     Each of the aforementioned misrepresentations and omissions were material in nature, in that they grossly understated Quarzo's liabilities, painted a grossly inaccurate rosy picture for Quarzo's prospects, and severely understated the risks associated with investing in Quarzo, especially in light of the heightened and undisclosed risk that the Hotel and the Quarzo properties would be lost in foreclosure.

100.    Intercol did, in fact, rely on the aforementioned misrepresentations and omissions and would not have invested $2,220,000.00 into the Quarzo Hotel Project but for Vargas' belief in the truth and veracity thereof.

101.    Moreover, also during the July 2009 meeting, and also in order to induce Intercol into making the $2.22 million investment in Quarzo, Defendants Arcila and Mahecha, in their capacity as agents, representatives and Members of Defendants Quarzo, Synergy, and OA Developments, represented to Vargas that Intercol's $2.22 million would specifically be used to finance the renovations of Building I contemplated by Phase I of the Project.

102.    The aforementioned representations were of a material nature, as Quarzo's long-term ability to pay Intercol the promised minimum guaranteed 10% rate of return was dependent on the Hotel Project being successfully advanced and carried-out as scheduled.

103.    The aforementioned representations made by Arcila and Mahecha were false, and Arcila and Mahecha knew of their falsity when made.

104.     Specifically, at the time Arcila and Mahecha made the aforementioned misrepresentations, each was aware of their intention to use Intercol's investment to pay-off a part of the interest that was owed to other investors from which the Defendants had borrowed millions of dollars in similarly-structured transactions, to make interest payments on the Quarzo Mortgage, and to pay down the principal on the Luna Mortgage.

105.     The aforementioned misrepresentations and omissions were material in nature, in that had Vargas known the truth regarding how Arcila and Mahecha intended to use Intercol's funds, he never would have agreed to the $2.22 million investment.

106.     Additionally, during the July 2009 meeting in Defendants' satellite Bogota office, and also in order to induce Intercol into making the $2.22 million investment in Quarzo, Defendants Arcila and Mahecha, in their capacity as agents, representatives and Members of Defendants Quarzo, Synergy, and OA Developments, represented to Vargas that Quarzo would have no problem whatsoever making the interest payments to Intercol pursuant to the terms of the First Promissory Note as they came due.

107.     Specifically, Arcila and Mahecha assured Vargas that, during Phase I of the Project, Quarzo would have funds available to timely make Intercol's semiannual interest payments from the rental proceeds generated by Buildings II and III, and from capital reserves specifically set aside and earmarked by Quarzo to pay Intercol the minimum guaranteed 10% yearly interest promised to it by Quarzo.

108.     The aforementioned representations made by Arcila and Mahecha were false, and Arcila and Mahecha knew of their falsity when made.

109.     Specifically, at the time Arcila and Mahecha made the aforementioned misrepresentations, Arcila and Mahecha were aware that Quarzo had already defaulted on

16

several similarly-structured notes issued to other individuals totaling, a fact that was deliberately kept from Vargas, and also knew that the actual and projected rental revenues were patently insufficient to pay Intercol as promised, and that no capital reserves had been earmarked to pay Intercol's interest.

110.    Arcila and Mahecha also knew that, given Quarzo's financial condition existing at the time and its likely prospects for the immediate future, there was absolutely no chance that Quarzo would be able to generate sufficient funds from the operation of the Hotel to pay Intercol even the minimum 10% interest payments owed it under the First Promissory Note as they came due.

111.    Instead, according to the financial data and revenue projections available to Quarzo at that time, Arcilla and Mahecha were well aware that, even under the best case scenario, all available revenues generated by the Hotel and the apartment rentals would be barely enough to cover Quarzo's projected day-to-day operating expenses and the interest payments on the Quarzo Mortgage.  There simply would be no money left over to pay Intercol, or any of the other similarly-situated note holders that had been defrauded by the Defendants.

112.    Not surprisingly, Quarzo has struggled to pay Intercol the accrued interest payments when due, and to date owes Intercol in excess of $500,000.00 in accrued and past due interest.

113.    Arcila and Mahecha also deliberately failed to disclose to Vargas that, at the time Intercol made the $2.22 million investment, there was absolutely no chance that Quarzo would be able to repay Intercol the principal amount as promised from the Hotel's actual projected revenue stream.

114.    Nevertheless, in order to induce Intercol into investing the $2.22 million, Arcila and Mahecha represented to Vargas that the principal would be repaid to Intercol by December 31, 2012, despite knowing that they had no intentions of repaying those sums at that time.

115.    But for the aforementioned misrepresentation, Intercol would not have invested the $2.22 in Quarzo.

116.    Intercol now realizes that the only way that Quarzo could have possibly paid Intercol the interest payments when due and the principal upon maturity was by luring enough new investors in order to infuse additional capital into the venture.

117.    However, such a strategy would only have the effect of sinking Quarzo further and further into debt and has all the earmarks of a classic and illegal Ponzi scheme.

118.    The Defendants, in fact, are currently endeavoring to bring in new investors into the venture by promising them impossibly high rates of return, with no realistic hope of being able to honor such new obligations.

119.    Also in order to fraudulently induce Intercol into making the $2,220,000 investment in Quarzo, Arcila and Mahecha deliberately misrepresented to Vargas that Intercol was actually purchasing stock in Quarzo and thereby becoming an equity owner of the Project.

120.    This deception was premised on Arcila and Mahecha's knowledge that Vargas could not read English and that he was relying on their confederate, Serebrenick, to review and translate the First Intercol Note to him.

121.    The aforementioned deception was further buttressed by the August 26, 2009 written in Spanish by Arcila and sent by him from Miami to Intercol in Colombia, confirming that Intercol had become a 3% owner of Quarzo, and advising Vargas that, as a shareholder, he

would be entitled to stay free of charge at Quarzo's Luxury Boutique Hotel for two weeks each year.

122.    It was subsequently reinforced by Arcila during Vargas' visit to the Quarzo Hotel, when Arcila introduced Vargas to Hotel staff members as a Shareholder of Quarzo despite knowing quite well that Intercol was not an Shareholder.

123.    It was reinforced yet again in July 2011, when Vargas was provided with a Stock Ownership Certificate which stated that Intercol was the owner of 4.75% of Quarzo's Class A Stock.

124.    The Certificate, however, was stamped "COPY" and no actual certificate was ever provided to Intercol.

125.    The foregoing representations, however, were false: At no time did Intercol ever become an actual Member/Shareholder of Quarzo, but was instead merely the holder of a convertible Note with only a qualified right to become an actual Shareholder.

126.    The misrepresentations regarding the actual structure of the investment were material in nature, as Intercol would not have agreed to invest in Quarzo had Vargas been accurately and honestly informed that the underlying transactions did not involve the outright purchase of Quarzo stock.

127.    In light of Arcila and Mahecha's convincing presentation that Quarzo was a company with great long-term prospects, Intercol was only interested in becoming an equity owner of Quarzo and would not have been interested in merely making a short-term loan to the company.

128.    Finally, in order to induce Intercol into making the $2,220,000 investment in Quarzo, Defendants Arcila and Mahecha, in their capacity as agents, representatives and

Members of Defendants Quarzo, Synergy, and OA Developments, failed to disclose to Vargas that Quarzo was engaged in a massive accounting and tax fraud.

129.     Vargas learned of Defendants' fraudulent accounting practices soon after February 1, 2012, the date on which he wrote a letter to Arcila and Mahecha demanding that he be sent copies of Quarzo's financial records, including copies of Quarzo's Federal Tax Returns for the years 2007 through 2011.

130.     No later than a few days after sending the aforementioned letter, Arcila telephoned Vargas form Miami and advised him that he needed to come to Miami in person to inspect the documents requested because Quarzo was keeping two sets of books, the official financial records used for tax purposes, and a secret second set of records reflecting the actual financial condition of the Company.

131.     Had Arcila and Mahecha disclosed the Defendants' unlawful accounting and tax practices from the onset to Vargas, Intercol would never have agreed to invest the $2.22 million in the Project.

132.     Needless to say, Vargas was stunned to learn that Quarzo was keeping two sets of books and that Arcila and Mahecha had, at the very minimum, engaged in a conspiracy to commit income tax evasion on behalf of Quarzo.

133.     It was at this point in time that he realized that Intercol had been defrauded by the Defendants.

## THE FIRST GIRALDO PROMISSORY NOTE

134.     On or about July 1, 2011, Plaintiff Victoria Giraldo was fraudulently induced by the Defendants into loaning Quarzo $500,000.00.

135.    At that time, Mrs. Giraldo met with Defendant Arcila, acting in his capacity as agent, representative and Member of Defendants Quarzo, Synergy, and OA Developments, and finalized a purchase of securities from Quarzo, to wit, Promissory Note # 1020297 issued by Quarzo to Mrs. Giraldo  (hereinafter referred to as the "First Giraldo Promissory Note" or "First Giraldo Note").  A copy of the First Giraldo Note is attached hereto as Exhibit "B."

136.    The aforementioned transaction was consummated during a face-to-face meeting held at the Defendants' Miami Offices located at Espirito Santa Plaza, 1395 Brickell, Avenue, Suite 1020.

## DEFENDANTS' FRAUD PERPETRATED ON GIRALDO

137.    During the aforementioned July 2011 meeting, Arcila made to Mrs. Giraldo several of the same material misrepresentations and omissions regarding Quarzo and the Project that had previously been made to Vargas.

138.    For instance, Arcila falsely represented to Mrs. Giraldo that the Hotel and the real estate owned by Quarzo had a market value in excess of $30 million, with a total debt of only between $14-$17 million, falsely represented that they had invested $8.5 million of their own funds into the Hotel Project, and materially failed to disclose that Quarzo was engaged on an ongoing basis in unlawful accounting and tax practices.

139.    Moreover, also in order to fraudulently induce Mrs. Giraldo into loaning the $500,000.00 and entering into the First Giraldo Promissory Note, Arcilla presented profit and loss figures and financial projections to Mrs. Giraldo which he knew was false and inaccurate.

140.    The aforementioned projections were presented to Mrs. Giraldo to convince her that Quarzo Hotel Project would soon be turning a sizable profit, which would enable it to re-pay

Mrs. Giraldo the $500,000 principal amount of her loan together with the 8-10% interest due pursuant to the First Giraldo Promissory Note.

141.    However, Arcila knew full well that the Defendants had manipulated and distorted the financials and that the Hotel's actual anticipated revenue stream would not be sufficient to pay Mrs. Giraldo the interest promised to her or to repay her the principal amount of the loan upon maturity.

142.    As Arcila was aware, the profit and loss figures and financial projections not only violated Generally Accepted Accounting Principles, but were also based on false and inaccurate figures which failed to account for Quarzo's overall liabilities, including Quarzo's liability to re-pay several million dollars in loans, as well as additional millions in loan interest payments that were already due or would soon become due.

143.    But for Mrs. Giraldo's reasonable reliance on Arcila material misrepresentations and omissions, she would not have made the subject loan to Quarzo.

## THE SECOND INTERCOL PROMISSORY NOTE

144.    Prior to Vargas' startling realization that he had fallen prey to a Ponzi scheme, Intercol engaged in a second transaction involving the sale or purchase of Quarzo securities.

145.    Specifically, on July 1, 2011, Intercol surrendered the First Intercol Promissory Note, and in exchange Quarzo provided Intercol with $462,500.00 obtained from Mrs. Giraldo, as well as a new promissory note, Promissory Note # 1020296, in the amount of one million seven hundred fifty-seven thousand five hundred dollars ($1,757,500.00) (hereinafter referred to as the "Second Intercol Promissory Note" or "Second Intercol Note").  A copy of the Second Intercol Promissory Note is attached hereto as Exhibit "C."

146.   The aforementioned transaction was consummated during the same face-to-face meeting held at the Defendants' Miami Offices during which Plaintiff Giraldo made her investment.

147.   During that presentation, Defendants Arcila reiterated several of the original fraudulent misrepresentations previously made to Vargas in procuring the First Intercol Promissory Note.

148.   For instance, Arcila once again falsely represented to Vargas that the Hotel and the real estate that it was on had a market value in excess of $30 million, with a total debt of only between $14-$17 million, falsely represented that they had invested $8.5 million of their own funds into the Hotel Project, and materially failed to disclose that Quarzo was engaged on an ongoing basis in unlawful accounting and tax practices.

149.   Moreover, during the July 2011 meeting, Arcila presented Vargas with the same misleading and inaccurate profit and loss figures and financial projections presented to Giraldo.

150.   Intercol relied in the aforementioned misrepresentations in agreeing to surrender the First Intercol Promissory Note and entering into a new arrangement that extended the maturity date in connection with the money Intercol had previously invested in Quarzo.

151.   Moreover, Intercol was also fraudulently induced into relinquishing the First Intercol Note by Arcila's verbal promise that, despite the surrender of the First Intercol Note, Intercol would still be paid the outstanding accrued interest owed to Intercol on the First Intercol Note as of July 1, 2011, which they promised would be paid by Quarzo as soon as possible, but no later than December 31, 2011.

152.    The aforementioned representations regarding the interest payments were made by Arcila during telephonic and face-to-face conversations with Vargas which took place in late June 2011 or early July 2011.

153.    The representations in questioned were of a material nature, as Intercol was owed $259,386.31 in accrued interest that remained outstanding and unpaid on the First Promissory Note as of July 1, 2011.

154.    Vargas relied on Arcila's representation and promise that Intercol would be paid the $259,386.31 owed on the First Intercol Promissory Note, as Intercol obviously had no intentions of waiving such a huge amount of interest and would never had surrendered the First Intercol Note nor agreed to enter into the July 2011 transaction but for the aforementioned representations.

155.    Arcila made their promise to pay Intercol the $259,386.31 in accrued  interest by no later than the end of 2011 knowing full well that Quarzo would not have sufficient revenues to make that payment as promised.

156.    In fact, at no point did Quarzo intend to actually pay Intercol the $259,386.31 owed on the First Intercol Promissory Note, and instead Arcila made that promise in order to induce Intercol to surrender the First Intercol Note so that Quarzo could claim that Intercol had lost its right to collect that interest by having surrendered the First Intercol Note.

157.    To date, no part of the $259,386.31 amount has been paid to Intercol.

158.    Moreover, during the July 2011 meeting, Defendants Arcila, acting as agent, representative and Member of Defendants Quarzo, Synergy, and OA Developments, and in order to convince Intercol to surrender the First Intercol Note, represented to Vargas that the terms of the two Notes were identical except for two differences: 1) the amount of the Second Note had

24

been reduced, and 2) the interest payments on the Second Intercol Note would be paid annually rather than semiannually.

159.    The foregoing representations were materially false, as Arcila knew that the Second Intercol Note contained new, significant and previously undisclosed terms that were contrary to the actual terms agreed upon by the Parties.

160.    Specifically, the Second Intercol Note materially deviated from the First Intercol Note in that payment of accrued interest would now be dependent on Quarzo actually generating net income, while the right to interest payments had previously been unconditional under the terms of the First Intercol Note.

161.    The Second Intercol Note also materially deviated from the First Intercol Note in that the maturity date would now be July 1, 2014 and "would automatically renew for periods of three years until [it] is paid or converted to an equity or membership interest in [Quarzo]", which essentially transformed the Second Intercol Note into one that never had to be repaid.  (EXH. C at 1).

162.    Finally, the Second Intercol Note also materially deviated from the First Intercol Note in that it stated that a flat 10% interest would be paid to Intercol, while the First Intercol Note set forth that the 10% amount constituted only the minimum amount that Intercol would receive.

163.    Intercol would have never agreed to the surrender the First Intercol Note or agreed to modify the existing arrangement had Vargas been advised that the Second Intercol Note would contain the aforementioned  undisclosed and unconsented material changes in terms.

## THE SECOND GIRALDO PROMISSORY NOTE

164.     Soon after Mrs. Giraldo and Quarzo consummated the initial transaction, Arcila contacted Mrs. Giraldo telephonically in order to convince her to invest additional funds in Quarzo.  During those telephone calls, Arcila represented to Mrs. Giraldo that Quarzo was in the process of renegotiating the terms of Quarzo's Mortgage with Mercantile Bank and were on the verge of obtaining a significant reduction in the interest rate on Quarzo's Mortgage.

165.     However, according to Arcila, Quarzo needed an additional $200,000.00 to pay to Mercantile Bank in order to obtain the interest rate reduction.

166.     Arcila also represented to Mrs. Giraldo that Quarzo needed the money right away or it would miss out on this golden opportunity to significantly lower the Project's liabilities.

167.     Arcila and Mahecha also represented to Mrs. Giraldo that if Quarzo was able to obtain the interest rate reduction on its Mortgage, it would be able to afford a higher rate of return on the $200,000.00 Quarzo was seeking from Mrs. Giraldo.

168.     Specifically, Arcila and Mahecha represented that Quarzo would be able to pay Mrs. Giraldo a 9-11% interest rate on the additional $200,000.00 investment.

169.     Mrs. Giraldo agreed to a face-to-face meeting and on July 29, 2011, the Parties once again met at the Defendants' Miami Offices located at Espirito Santa Plaza.

170.     During the aforementioned meeting, Mrs. Giraldo met Mahecha for the first time and Mahecha reiterated the representations previously made by Arcila over the telephone regarding the interest rate reduction on the Quarzo Mortgage.

171.     During the aforementioned meeting, Mrs. Giraldo handed Arcila and Mahecha a check in the amount of $200,000.00 made out to Quarzo from an account held by Mrs. Giraldo's son, Victor Guillermo Giraldo ("Victor Giraldo").

26

172.    Also during that meeting, Mrs. Giraldo received Promissory Note No. 1020300, in the amount of $200,000.00 (hereinafter referred to as the "Second Giraldo Promissory Note" or "Second Giraldo Note").

173.    Although the Payee in the Second Giraldo Note is Victor Giraldo rather than his mother, Mrs. Giraldo at all times had the authority to enter into the subject transaction on behalf of her son.

175.    In reaching the decision to enter into the Second Giraldo Note, Mrs. Giraldo relied on the same material misrepresentations and omissions made to her by Arcila in inducing her to enter into the First Giraldo Note, as well as subsequent assurances from Arcila and Mahecha that the Project continued to do well financially and would be in an even stronger financial position once the interest rate on the Mortgage was lowered.

176.    The aforementioned representations were false, as the Project was and continues to be in dire financial straits, a fact unequivocally known to Arcila and Mahecha.

177.    Mrs. Giraldo also relied on Arcila and Mahecha's representations that the $200,000.00 was specifically needed for and would be used to fund the Mortgage loan renegotiation and obtain the substantially reduced interest rate.

179.    Instead, Arcila and Mahecha at all times planned to use the $200,000.00 for unrelated matters, including to pay-off some of the more disgruntled, undisclosed investors from which the Defendants had borrowed millions of dollars in similarly-structured transactions and to cover expenses related to Luna rather than Quarzo.

180.    The aforementioned representations were material in nature, as Mrs. Giraldo would not have gone through with the Second Giraldo Note transaction but for Arcila and Mahecha's misrepresentations and material omissions regarding the intended use of the funds.

181.    Arcila and Mahecha also misrepresented to Mrs. Giraldo that, as a result of obtaining the lower interest rate on the Quarzo Mortgage, Quarzo would be in a significantly better financial position and would be able to pay Mrs. Giraldo a 9-11% interest rate on the $200,000.00.

183.    Moreover, Arcila and Mahecha were aware that, in light of Quarzo's precarious true financial state, Quarzo would never be able to pay the interest rate promised by Arcila and Mahecha on the additional $200,000.00 loan or repay the underlying principal amount from Quarzo's projected revenue stream – at least not without defaulting on its many obligations to Mercantil Bank and the myriad undisclosed investors waiting in line ahead of Mrs. Giraldo to be paid the principal and interest owed them.

184.    As a result of the Defendants' improper and illegal conduct as set forth herein, Intercol and Giraldo have been forced to retain the services of the undersigned attorney and are obligated to pay a reasonable fee for his services.

185.    All conditions precedent have been performed, waived, or have otherwise been excused.

186.    Plaintiffs seek and demand a trial by jury on all triable issues in this matter

### (COUNT I)

### (By Intercol and Against all Defendants Except Luna)
### SECURITIES FRAUD IN CONNECTION THE INTERCOL PROMISSORY NOTES

187.    Intercol restates and incorporates by reference the allegations set forth in paragraphs 1-186 of the Complaint, as though fully set forth herein.

188.    This is a claim for securities fraud against all Defendants except Luna pursuant to Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. 240.10b-5 ("Rule 10b-5").

189.    The First and Second Intercol Promissory Notes constitute "securities" pursuant to § 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10).

190.    The First and Second Intercol Notes constitute "investment contracts" for the purposes of the Securities Exchange Act in that Intercol invested its money in a common enterprise, the Quarzo Hotel Project, and was led to expect profits derived solely from the efforts of the Defendants Quarzo, Arcila, Mahecha and OA Developments.

191.    As fully detailed in the incorporated allegations, Defendants Arcila, Mahecha, Quarzo, OA Developments and Synergy have employed a scheme, device, and artifice to defraud in connection with the sale of securities to Intercol.

192.    In furtherance thereof, Defendants Arcila and Mahecha, acting in their capacities as principals and agents of Defendants Quarzo, Synergy and OA Developments, made untrue statements of fact and omitted other material facts necessary to make their affirmative statements, in light of the circumstances under which they were, not misleading.

193.    In so doing, Defendants Arcila and Mahecha, acting in their capacities as principals and agents of Defendants Quarzo, Synergy and OA Developments, acted with the intent to deceive, manipulate and defraud Intercol.

194.    Also in furtherance of their fraudulent scheme, Defendants Arcila and Mahecha, acting in their capacities as principals and agents of Defendants Quarzo, Synergy and OA Developments, have used and caused to be used the mails and means of transportation and communication in interstate commerce.

195.    Arcila and Mahecha frequently communicated via electronic mail and the telephone with each other, with Defendants' agents and employees, with third parties, and with the victims of their scheme, including Vargas.

196.    The national telephonic network is an instrumentality, means and facility of interstate commerce.

197.    In this case, many of the even purely intrastate telephone calls made by the Defendants involve constitutive radio and electronic signals which traveled and cross state lines during the course of such calls.

198.    The internet is also recognized as a channel and instrumentality of interstate commerce, and electronic transmissions sent over the internet travel in interstate commerce.

199.    The herein named Defendants have also employed the national banking system to further their scheme, for such purposes as to clear checks, deposit ill-gotten gains, and send and receive wire-transfers in interstate commerce.

200.    Aside from direct liability under 10b-5, Defendants Arcila and Mahecha are also jointly and severally liable as persons in control of Defendants Quarzo, OA Developments and Synergy pursuant to § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a).

201.    As a result of Defendants' untrue statements and material omissions and Intercol's reliance thereupon, Intercol was fraudulently induced into initially investing $2.22 million into what is essentially a Ponzi Scheme, and was subsequently deceived into surrendering the First Intercol Promissory Note in exchange for the Second Intercol Promissory Note, which contained several material and previously undisclosed and unconsented to changes in terms adverse to Intercol's interests.

202.    Moreover, as a direct and proximate result of Defendants' untrue statements and material omissions and Intercol's reliance thereupon, Intercol has suffered consequential damages, including the loss of use of the funds invested, the loss of interest thereupon, and the loss of the principal amount invested.

WHEREFORE, Intercol demands judgment against Defendants Arcila, Mahecha, Quarzo, Synergy and OA Developments, jointly and severally, for compensatory damages, attorneys fees, and costs, interest, and such further relief as this Court deems just and proper.

## (COUNT II)

## (By Intercol Against all Defendants except Luna)
## FRAUDULENT MISREPRESENTATION

203.    Intercol restates and incorporates by reference the allegations set forth in paragraphs 1-186 of the Complaint, as though fully set forth herein.

204.    This is a claim for fraudulent misrepresentation pursuant to Florida common law.

205.    As fully detailed in the incorporated allegations, Defendants Arcila and Mahecha, individually and in their capacity as authorized agents of Defendants Quarzo, OA Developments and Synergy, have made untrue statements of fact and omitted other material facts necessary to make their affirmative statements not misleading.

206.    In so doing, Defendants Arcila and Mahecha acted deliberately and with the intent to deceive, manipulate and defraud Intercol, and made the subject misrepresentations and material omissions with the intent that Intercol rely on said representations and material omissions.

207.    Intercol reasonably relied to its detriment on the representations and omissions, but for which Intercol would never had invested in Quarzo or agreed to surrender the First Intercol Promissory Note.

208.    Defendants actions were intentional, wanton, malicious, and made with the intent to injure Intercol or with reckless disregard for Intercol's lawful rights.

209.    As a direct and proximate result of Defendants' untrue statements and material omissions and Intercol's reliance thereupon, Intercol has suffered millions of dollars in

consequential damages, including the loss of use of the funds invested, the loss of interest thereupon, and the loss of the principal amount invested.

WHEREFORE, Plaintiff Intercol demands judgment against Defendants Arcila, Mahecha, Quarzo, OA Developments and Synergy for compensatory damages, punitive damages, costs, prejudgment interest, post-judgment interest, and such further relief as this Court deems just and proper.

**(COUNT III)**

**(By Intercol and Giraldo Against Mahecha and Arcila)**
**CIVIL RACKETEERING IN VIOLATION OF FLORIDA STATUTORY LAW**

210. Intercol and Giraldo restate and incorporate by reference the allegations set forth in paragraphs 1-186 of the Complaint, as though fully set forth herein.

211. This is a claim by both Plaintiffs against Arcila and Mahecha for civil racketeering pursuant to Florida's Civil Remedies for Criminal Practices Act, Fla.Stat. §§ 772.101 *et. seq.*

212. As fully detailed in the incorporated allegations, Defendants Arcila and Mahecha have masterminded and perpetrated a scheme to defraud in violation of Chapter 817 of the Florida Statutes, which proscribes and criminalizes certain fraudulent practices, false pretenses, fraud generally, and credit card crimes.

213. In so doing, Defendants Arcila and Mahecha have been employed by or associated with multiple enterprises in order to conduct or participate, directly or indirectly, in such enterprises through a pattern of criminal activity, in violation of Fla.Stat. § 772.103 (3).

214. The aforementioned subject enterprises consist of Quarzo, OA Developments and Synergy.

215.     As a result of Arcila and Mahecha's violation of Fla.Stat. § 772.103 (3), the Plaintiffs have suffered pecuniary damages.

WHEREFORE, Plaintiffs Intercol and Giraldo demand judgment against Defendants Arcila and Mahecha pursuant to Fla.Stat. § 772.104 for compensatory damages, treble damages, costs, prejudgment interest, post-judgment interest, and such further relief as this Court deems just and proper.

## (COUNT IV)

### (By Intercol Against all Defendants except Luna)
### <u>VIOLATION OF FLORIDA'S UNFAIR AND DECEPTIVE TRADE PRACTICES ACT</u>

216.     Intercol restates and incorporates by reference the allegations set forth in paragraphs 1-186 of the Complaint, as though fully set forth herein.

217.     This is an action for violation of Florida's Deceptive and Unfair Trade Practices Act, Fla.Stat. §§ 501.201 *et. seq.*

218.     As fully detailed in the incorporated allegations, Defendants' pattern of conduct in luring and deceiving investors such as Intercol constitutes unfair and deceptive trade practices, in material contravention of Florida Statutes § 501.204 (1).

219.     As a direct and proximate result of Defendants' unfair and deceptive trade practices, Intercol has suffered damages including the loss of use of the funds invested, the loss of interest thereupon, and the loss of the principal amount invested.

WHEREFORE, Intercol demands judgment against Defendants for the above-described compensatory damages, costs, attorneys' fees, and for such further relief as this Court deems just and proper.

## (COUNT V)

**(By Intercol and Against Defendants Arcila, Mahecha, Siynergy and Luna)**

<u>**CONVERSION**</u>

220.    Intercol restates and incorporates by reference the allegations set forth in paragraphs 1-186 of the Complaint, as though fully set forth herein.

221.    This is an action for conversion pursuant to Florida common law.

222.    Intercol invested $2.22 million in Quarzo for the express purpose and understanding that said funds be specifically used to finance the renovations of Building I contemplated by Phase I of the Project.

223.    Defendants Arcila and Mahecha misappropriated Intercol's funds by improperly using Intercol's investment to pay-off a part of the interest that was owed to other investors from which the Defendants had borrowed millions of dollars in similarly-structured transactions and by siphoning-off a portion of those funds to Defendants Synergy and Luna.

224.    Through their conduct, Defendants Arcila, Mahecha, Synergy and Luna have exercised dominion over Intercol's money, and have interfered with Intercol's ownership rights over that money.

225.    In doing so, Defendants Arcila, Mahecha, Synergy and Luna acted with the felonious intent to deprive Intercol of its property.

226.    Despite repeated demands by Intercol, Defendants have refused to return Intercol its money.

227.    As a direct and proximate result of Defendants' misconduct, Intercol has suffered damages, including but not limited to loss of use of its money and loss of interest on the subject monies.

**WHEREFORE**, Plaintiff Intercol demands judgment against Defendants Arcila, Mahecha, Synergy and Luna for compensatory damages, punitive damages, costs, prejudgment interest, post-judgment interest, and for such further relief as this Court deems just and proper.

(COUNT VI)

**(By Intercol Against Arcila and Mahecha)**
**<u>CONSPIRACY TO DEFRAUD</u>**

228.    Intercol restates and incorporates by reference the allegations set forth in paragraphs 1-186 and 203-209 of the Complaint, as though fully set forth herein.

229.    This is a claim for civil conspiracy to defraud pursuant to Florida common law.

230.    As fully detailed in the incorporated allegations, Defendants Arcila, Mahecha and others agreed and conspired to act in concert and combination, and did in fact act in concert and combination to defraud Intercol out of its money.

231.    In so doing, Defendants Arcila and Mahecha have committed overt acts, including but not limited to the making of false statements and material omissions with the intent to deceive, manipulate and defraud Intercol.

232.    As a result of the conspiracy and the overt acts taken by the coconspirators, Intercol has suffered damages.

233.    Defendants' actions were intentional, wanton, malicious, and made with the intent to injure Intercol or with reckless disregard for Intercol's lawful rights.

234.    As a direct and proximate result of Defendants' conspiracy, Intercol has suffered millions of dollars in consequential damages, including the loss of use of the funds invested, the loss of interest thereupon, and the loss of the principal amount invested.

WHEREFORE, Plaintiff Intercol demands judgment against Defendants Arcila and Mahecha, jointly and severally, for compensatory damages, punitive damages, costs,

prejudgment interest, post-judgment interest, and such further relief as this Court deems just and proper.

(COUNT VII)

(By Intercol Against Defendants Quarzo)
REFORMATION OF THE SECOND INTERCOL PROMISSORY NOTE

235.    Intercol restates and incorporates by reference the allegations set forth in paragraphs 1-186 of the Complaint, as though fully set forth herein.

236.    This is an action for equitable reformation of contract directed at the Second Intercol Promissory Note.

237.    Due to fraud on the part of Quarzo's principals Arcila and Mahecha, the express terms set forth in the Second Intercol Promissory Note are materially inconsistent with the actual agreement reached between Quarzo and Intercol.

239.    Moreover, pursuant to the true and actual agreement entered into by Quarzo and Intercol, the remaining terms of the two Notes were to be identical except for two differences: 1) the amount of the Second Intercol Note would be reduced to $1,757,500.00, and 2) the interest payments on the Second Intercol Note would be paid annually rather than semiannually.

240.    Despite their clear agreement, the Second Intercol Note failed to reflect Quarzo's continuing obligation to pay Intercol the $259,386.31 accrued interest, materially deviated from the First Intercol Note in that payment of accrued interest would now be dependent on Quarzo actually generating net income, and materially deviated from the First Intercol Note in that it contained a maturity date of July 1, 2014 and "would automatically renew for periods of three years until [it] is paid or converted to an equity or membership interest in [Quarzo]", which essentially transformed the Second Intercol Note into one that never had to be repaid.  (EXH. C at 1).

241.     Pursuant to the terms of the true and actual agreement between the Parties, Quarzo was obligated to repay Intercol's principal by December 31, 2012.

242.     Moreover, pursuant to the true and actual terms of the agreement between the Parties, Intercol was to receive a *minimum* ten percent (10%) return on its investment, and would also be entitled to a proportionate share of the profits above-and-beyond the 10% return depending on Quarzo's net revenues.

243.     The aforementioned entitlement was also improperly omitted from the terms of the Second Intercol Note.

244.     Pursuant to equitable principles, the reformation of the Second Intercol Note is warranted so that it accurately reflects the true and correct terms of the agreement actually reached between Quarzo and Intercol.

**WHEREFORE**, Plaintiff Intercol demands judgment against Defendant Quarzo for equitable reformation of the Second Intercol Promissory Note, and for such further relief as this Court deems just, proper and equitable.

## (COUNT VIII)

### (By Intercol Against Defendant Quarzo)
### <u>BREACH OF THE SECOND INTERCOL NOTE AS REFORMED</u>

245.     Intercol restates and incorporates by reference the allegations set forth in paragraphs 1-186 and 235-244 of the Complaint, as though fully set forth herein.

246.     This is an action for breach of contract of the Second Intercol Note as reformed to reflect the true and correct terms of the actual agreement reached by Intercol and Quarzo on or about July 1, 2011 (the "Reformed Agreement").

247.     Pursuant to the terms of the Reformed Agreement actually reached between the Parties, Quarzo was obligated to pay Intercol by no later than December 31, 2011 the $259,386.31 due in accrued interest on the First Intercol Note as of July 1, 2011.

248.     Also pursuant to the terms of the Reformed Agreement, Quarzo was obligated to pay Intercol a minimum interest at the yearly rate of 10% on the principal amount of $1,757,500.00, as well as additional interest depending on the profitability of Quarzo's operations.

249.     Despite the fact that Intercol has fully performed its obligations under the Reformed Agreement, Quarzo has breached its obligations thereunder by failing to pay the $259,389.00 past due amount due December 31, 2011 and failing to pay any of the interest payments that have accrued since July 1, 2011.

250.     As a result of Quarzo's breaches of the Reformed Agreement, Intercol has suffered pecuniary damages.

**WHEREFORE**, Plaintiff Intercol demands judgment against Defendant Quarzo for compensatory damages, costs, prejudgment interest, post-judgment interest, and for such further relief as this Court deems just and proper.

### (COUNT IX)

### (By Intercol Against Defendant Quarzo)
### EQUITABLE ACCOUNTING

251.     Intercol restates and incorporates by reference the allegations set forth in paragraphs 1-186 and 236-262 of the Complaint, as though fully set forth herein.

252.     This is an action for equitable accounting pursuant to Florida common law.

253.     Intercol and Quarzo are involved in a complex transaction which gives rise to a right for an equitable accounting of Quarzo's business and finances in favor of Intercol.

254.    Specifically, pursuant to the Second Intercol Promissory Note, Intercol's right to be paid accrued interest is dependent on Quarzo generating a net income in its operations.

255.    While Intercol denies that it ever agreed to such a condition and endeavors to reform the terms of the Second Intercol Promissory Note to reflect the true terms agreed to between the Parties, Intercol nevertheless seeks an equitable accounting in an abundance of caution in order to protect its rights in the event that its claim for reformation is unsuccessful.

256.    Intercol is also entitled to an accounting in the event its claim for reformation is successful because, pursuant to the alleged terms of the true agreement between the Parties, Intercol was to receive a minimum ten percent (10%) return on its investment, and would also be entitled to a proportionate share of the profits above-and-beyond the 10% return depending on Quarzo's net revenues.

257.    Intercol lacks an adequate remedy of law because, absent an accounting, Intercol will not be able to establish its entitlement to a share of Quarzo's profits above-and-beyond the 10% minimum return agreed to by the Parties.

**WHEREFORE**, Plaintiff Intercol demands judgment against Defendant Quarzo for an equitable accounting and for such further relief as this Court deems just and proper.

### (COUNT X)

### (By Intercol Against Defendant Luna)
### <u>IMPOSITION OF EQUITABLE LIEN</u>

258.    Intercol restates and incorporates by reference the allegations set forth in paragraphs 1-186 of the Complaint, as though fully set forth herein.

259.    Defendants Arcila and Mahecha, through deception, false pretenses and conversion, have diverted funds provided by Intercol specifically earmarked to finance the Quarzo Hotel Project to Defendant Luna.

260.     The aforementioned funds have been improperly used to enrich Luna, including to pay down the mortgage on property owned by Luna.

261.     Under such circumstances, the imposition of an equitable lien on the assets of Luna, including all real property, bank accounts and other things of value owned by Luna is warranted pursuant to general principles of fairness, good faith and justice.

262.     Intercol lacks an adequate remedy of law against Luna capable of providing a full, practical and expedient remedy under the circumstances.

**WHEREFORE**, Plaintiff Intercol demands judgment against Defendant Luna for the imposition of an equitable lien and for such further relief as this Court deems just, proper and equitable.

## (COUNT XI)

### (By Giraldo and Against all Defendants Except Luna)
### <u>SECURITIES FRAUD IN CONNECTION THE GIRALDO PROMISSORY NOTES</u>

263.     Mrs. Giraldo restates and incorporates by reference the allegations set forth in paragraphs 1-186 of the Complaint, as though fully set forth herein.

264.     This is a claim for securities fraud against all Defendants pursuant to Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. 240.10b-5 ("Rule 10b-5").

265.     The First and Second Giraldo Promissory Notes constitute "securities" pursuant to § 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10).

266.     The First and Second Giraldo Notes constitute "investment contracts" for the purposes of the Securities Exchange Act in that Giraldo invested her money in a common enterprise, the Quarzo Hotel Project, and was led to expect profits derived solely from the efforts of the Defendants Quarzo, Arcila, Mahecha and OA Developments.

267.     As fully detailed in the allegations incorporated herein, Defendants Arcila, Mahecha, Quarzo, OA Developments and Synergy have employed a scheme, device, and artifice to defraud in connection with the sale of securities to Mrs. Giraldo.

268.     In furtherance thereof, Defendants Arcila and Mahecha, acting in their capacities as principals and agents of Defendants Quarzo, Synergy and OA Developments, made untrue statements of fact and omitted other material facts necessary to make their affirmative statements, in light of the circumstances under which they were, not misleading.

269.     In so doing, Defendants Arcila and Mahecha acted with the intent to deceive, manipulate and defraud Giraldo.

270.     Also in furtherance of their fraudulent scheme have used and caused to be used the mails and means of transportation and communication in interstate commerce.

271.     Arcila and Mahecha frequently communicated via electronic mail and the telephone with each other, with Defendants' agents and employees, with third parties, and with the victims of their scheme, – including Mrs. Giraldo.

272.     The national telephonic network is an instrumentality, means and facility of interstate commerce.

273.     In this case, many of the even purely intrastate telephone calls made by the Defendants involve constitutive radio and electronic signals traveled and cross state lines during the course of such calls.

274.     The internet is also recognized as a channel and instrumentality of interstate commerce, and electronic transmissions sent over the internet travel in interstate commerce.

275.     The herein named Defendants have also employed the national banking system to further their scheme, for such purposes as to clear checks, deposit ill-gotten gains, and send and receive wire-transfers in interstate commerce.

276.     Aside from direct liability under 10b-5, Defendants Arcila and Mahecha are also jointly and severally liable as persons in control of Defendants Quarzo, OA Developments and Synergy pursuant to § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a).

277.     As a result of Defendants' untrue statements and material omissions and Giraldo's reliance thereupon, Mrs. Giraldo was fraudulently induced into investing a total of $700,000.00 into what is essentially a Ponzi Scheme.

278.     Moreover, as a direct and proximate result of Defendants' untrue statements and material omissions and Mrs. Giraldo's reliance thereupon, she has suffered pecuniary damages, including the loss of use of the funds invested, the loss of interest thereupon, and the loss of the principal amount invested.

WHEREFORE, Plaintiff Giraldo demands judgment against Defendants Arcila, Mahecha, Quarzo, Synergy and OA Developments, jointly and severally, for compensatory damages, attorneys fees, and costs, interest, and such further relief as this Court deems just and proper.

## (COUNT XII)

### (By Giraldo Against all Defendants except Luna)
### FRAUDULENT MISREPRESENTATION IN CONNECTION WITH
### THE GIRALDO PROMISSORY NOTES

279.     Mrs. Giraldo restates and incorporates by reference the allegations set forth in paragraphs 1-186 of the Complaint, as though fully set forth herein.

280.     This is a claim for fraudulent misrepresentation pursuant to Florida common law.

281.     As fully detailed in the allegations incorporated herein, Defendants Arcila and Mahecha, individually and in their capacity as authorized agents of Defendants Quarzo, OA Developments and Synergy, have made untrue statements of fact and omitted other material facts necessary to make their affirmative statements not misleading.

282.     In so doing, Defendants Arcila and Mahecha acted deliberately and with the intent to deceive, manipulate and defraud Giraldo, and made the subject misrepresentations and material omissions with the intent that Giraldo rely on said representations and material omissions.

283.     Mrs. Giraldo reasonably relied to its detriment on the representations and omissions, but for which Mrs. Giraldo would never had invested in Quarzo or agreed to enter into First or Second Giraldo Promissory Notes.

284.     Defendants actions were intentional, wanton, malicious, and made with the intent to injure Mrs. Giraldo or with reckless disregard for Mrs. Giraldo's lawful rights.

285.     As a direct and proximate result of Defendants' untrue statements and material omissions and Mrs. Giraldo's reliance thereupon, Mrs. Giraldo has suffered consequential damages, including the loss of use of the funds invested, the loss of interest thereupon, and the loss of the principal amount invested.

WHEREFORE, Plaintiff Giraldo demands judgment against Defendants Arcila, Mahecha, Quarzo, OA Developments and Synergy for compensatory damages, punitive damages, costs, prejudgment interest, post-judgment interest, and such further relief as this Court deems just and proper.

**(COUNT XIII)**

**(By Giraldo Against Arcila and Mahecha)**
**<u>CONSPIRACY TO DEFRAUD</u>**

286.     Mrs. Giraldo restates and incorporates by reference the allegations set forth in paragraphs 1-186 and 279-285 of the Complaint, as though fully set forth herein.

287.     This is a claim for civil conspiracy to defraud pursuant to Florida common law.

288.     As fully detailed in the incorporated allegations, Defendants Arcila, Mahecha and others agreed and conspired to act in concert and combination, and did in fact act in concert and combination to defraud Mrs. Giraldo out of her money.

289.     In so doing, Defendants Arcila and Mahecha have committed overt acts, including but not limited to the making of false statements and material omissions with the intent to deceive, manipulate and defraud Mrs. Giraldo.

290.     As a result of the conspiracy and the overt acts taken by the coconspirators, Mrs. Giraldo has suffered damages.

291.     Defendants' actions were intentional, wanton, malicious, and made with the intent to injure Mrs. Giraldo or with reckless disregard for her lawful rights.

292.     As a direct and proximate result of Defendants' conspiracy, Mrs. Giraldo has suffered pecuniary damages, including the loss of use of the funds invested, the loss of interest thereupon, and the loss of the principal amount invested.

WHEREFORE, Plaintiff Giraldo demands judgment against Defendants Arcila and Mahecha, jointly and severally, for compensatory damages, punitive damages, costs, prejudgment interest, post-judgment interest, and such further relief as this Court deems just and proper.

### (COUNT XIV)

### (By Giraldo Against Defendants except Luna)
### VIOLATION OF FLORIDA'S UNFAIR AND DECEPTIVE TRADE PRACTICES ACT

292.     Mrs. Giraldo restates and incorporates by reference the allegations set forth in paragraphs 1-186 of the Complaint, as though fully set forth herein.

293.     This is an action for violation of Florida's Deceptive and Unfair Trade Practices Act, Fla.Stat. §§ 501.201 *et. seq.*

294.     Defendants' pattern of conduct in luring and deceiving investors such as Mrs. Giraldo constitutes unfair and deceptive trade practices, in material contravention of Florida Statutes § 501.204 (1).

295.     As a direct and proximate result of Defendants' unfair and deceptive trade practices, Mrs. Giraldo has suffered damages including the loss of use of the funds invested, the loss of interest thereupon, and the loss of the principal amount invested.

**WHEREFORE**, Giraldo demands judgment against Defendants for the above-described compensatory damages, costs, attorneys' fees, and for such further relief as this Court deems just and proper.

## (COUNT XV)

### (By Giraldo and Against Defendants Arcila, Mahecha and Luna)
### <u>CONVERSION</u>

296.     Mrs. Giraldo restates and incorporates by reference the allegations set forth in paragraphs 1-186 of the Complaint, as though fully set forth herein.

297.     This is an action for conversion pursuant to Florida common law.

298.     Mrs. Giraldo loaned $200,000.00 to Quarzo for the express and specific purpose that the money would be used in its entirety to finance and obtain a substantial interest rate reduction on the Quarzo Mortgage with Mercantile Bank.

399.     Defendants Arcila and Mahecha misappropriated Mrs. Giraldo's funds by improperly diverting that money to Luna.

45

300.     Through their conduct, Defendants Arcila, Mahecha and Luna have exercised dominion over Mrs. Gitaldo's money, and have interfered with her ownership rights over that money.

301.     In doing so, Defendants Arcila, Mahecha and Luna acted with the felonious intent to deprive Mrs. Giraldo of her property.

302.     Despite repeated demands by Mrs. Giraldo, Defendants Arcila, Mahecha and Luna have refused to return Mrs. Giraldo her money.

303.     As a direct and proximate result of Defendants Arcila, Mahecha and Luna's misconduct, Mrs. Giraldo has suffered damages, including but not limited to loss of use of its money and loss of interest on the subject monies.

**WHEREFORE**, Plaintiff Giraldo demands judgment against Defendants Arcila, Mahecha and Luna for compensatory damages, punitive damages, costs, prejudgment interest, post-judgment interest, and for such further relief as this Court deems just and proper.

## (COUNT XVI)

### (By Giraldo Against Defendant Luna)
### <u>IMPOSITION OF EQUITABLE LIEN</u>

304.     Mrs. Giraldo restates and incorporates by reference the allegations set forth in paragraphs 1-186 of the Complaint, as though fully set forth herein.

305.     Defendants Arcila and Mahecha, through deception, false pretenses and conversion, have diverted funds provided by Mrs. Giraldo for the express and specific purpose obtaining a substantial interest rate reduction on the Quarzo Mortgage with Mercantile Bank

306.     The aforementioned funds have instead been improperly used to enrich Luna, including to pay down the mortgage on property owned by Luna.

307.    Under such circumstances, the imposition of an equitable lien on the assets of Luna, including all real property, bank accounts and other things of value owned by Luna is warranted pursuant to general principles of fairness, good faith and justice.

306.    Mrs. Giraldo lacks an adequate remedy of law against Luna capable of providing a full, practical and expedient remedy under the circumstances.

**WHEREFORE**, Plaintiff Giraldo demands judgment against Defendant Luna for the imposition of an equitable lien and for such further relief as this Court deems just, proper and equitable.

Respectfully submitted on this December 18, 2012.

> **RAUL E. ESPINOZA, P.L.**
> Attorney for Plaintiffs
> 175 SW 7th Street, Suite 1806
> Miami, Florida 33130
>
> By: _____/s/ Raul E. Espinoza_____
> **Raul E. Espinoza, Esq.**
> Florida Bar No.: 50664
> Tel.: 786.539.5410
> Fax: 786.539.5411
> Email: respinoza@repalaw.com